# EXHIBIT 1

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - September 28, 2016 - 10:10 AM

**IN THE MISSOURI COURT OF APPEALS**
**EASTERN DISTRICT**

| | | |
|---|---|---|
| BRUCE FRANKS, JR., | ) | No. ED104797 |
| Respondent, | ) | |
| v. | ) | Appeal from the Circuit Court of the City of St. Louis Cause No. 1622-CC09996 |
| PENNY HUBBARD | ) | |
| Appellant. | ) | |

**BOARD OF ELECTION COMMISSIONS OF THE CITY OF ST. LOUIS'**
**MOTION FOR LEAVE TO FILE AND**
**MOTION TO MODIFY COURT'S SEPTEMBER 13, 2016 OPINION**

**INTRODUCTION**

On September 13, 2016 the Court issued its Opinion, affirming a new primary election needed to be held in the 78th State House District. The Court analyzed the absentee ballot voting process that had occurred in the primary voting for the election. The Board of Election Commissioners of the City of St. Louis ("the Board") seeks clarity as to the Court's Opinion regarding the use of touch-screen voting machines in absentee voting in future elections. Members of the public, including the Missouri Council for the Blind, and other election authorities have expressed concern regarding the Opinion's impact on touch-screen voting. *See* Exhibits A, B. Absentee voting for the November 8, 2016 election has already begun in the City of St. Louis. The Board seeks a modification of the Court's Order so it is clear the Board may proceed with use of the touch-screen machines for voters requiring electronic assistance.

## MOTION FOR LEAVE

The Board was originally named as a party in this litigation but was dismissed at the trial court because RSMo. §§ 115.526 and 115.531 do not permit a contestee of an election to bring suit against the election administrators. Since the filing of the Court's Opinion, the Board has been directly impacted as questions have arisen regarding the Opinion's control on the use of touch-screen voting machines. Given the public nature of these facts and the impact to future elections, the Board seeks leave of Court to file its Motion to Modify. Leave should be granted so the Court may decide the merits of the Board's Motion.

## MOTION TO MODIFY[1]

The Board seeks clarification as to whether the Opinion is intended to preclude touch-screen absentee ballot voting for the disabled. Touch-screen voting may be required by numerous federal statutes, including: the Help America Vote Act[2], Section 504 of the Rehabilitation Act[3], and/or the Americans with Disabilities Act[4]. Pursuant to the Supremacy Clause of the U.S. Constitution, these laws appear to require the Board allow qualified disabled voters access to a non-visual voting machines and an opportunity to vote in private without assistance. The United States Court of Appeals for the Fourth Circuit upheld access to electronic voting under the Americans with Disabilities Act held earlier this year. *Nat'l Fed. Of the Blind, et al. v. Lamone, et al.*, 813 F.3d 494 (4th Cir. 2016). For instance, persons with visual impairments or manual dexterity impairments may be unable to complete a paper ballot without assistance from another person and might require such persons to disclose their choice of candidates to election officials or others. On the other hand, touch-screen voting machines can

---

[1] This Motion is timely filed within fifteen days after the Court filed its opinion. Mo. Sup. Ct. R. 84.17(b).
[2] 52 U.S.C. § 20901-21145
[3] 29 U.S.C. § 794
[4] 42 U.S.C. § 12101 *et seq.*

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - September 28, 2016 - 10:10 AM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - September 28, 2016 - 10:10 AM

be adapted to have an audio feature with headphones that would allow the visually impaired to vote confidentially.  Some disabled voters may not be able to vote or vote confidentially without touch-screen voting machines.

Although the Court's Opinion regarded the primary for the 78th State House District, it has potentially impacted administration of future absentee voting in separate elections, including the upcoming November 8, 2016 presidential election. The Board's Chair received a letter on September 23, 2016 from John Ammann of the St. Louis University Law School Legal Clinics in his capacity as an attorney for the Executive Director of the Missouri Council for the Blind. Exhibit A.  Mr. Ammann expressed concerns for the disabled if touch-screen absentee voting is not available to the disabled.  A September 26, 2016 St. Louis Post-Dispatch article indicated election authorities throughout the State of Missouri share these concerns. Exhibit B.

Therefore, the Board respectfully suggests the Court modify its September 13, 2016, Opinion pursuant to this Motion or the Court's own motion to add clarification as to the Opinion's impact on touch-screen voting machines.  The Board respectfully suggests the following sentence: "This Opinion does not bar the use of touch-screen absentee ballot voting without the use of envelopes for persons who appear in person to vote absentee and who demonstrate that a disability prevents them from voting using a paper ballot but would be able to vote using a touch-screen voting machine."

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - September 28, 2016 - 10:10 AM

Respectfully submitted,

LATHROP & GAGE LLP

*/s/ Matthew Jacober*

Matthew A. Jacober
David W. Sweeney, # 57144
Patricia L. Silva # 67213
Joshua L. Loevy, #66047
mjacober@lathropgage.com
psilva@lathrogage.com
jloevy@lathropgage.com
7701 Forsyth Boulevard, Suite 500
Clayton, Missouri  63105
Phone:  (314) 613-2800
Fax:   (314) 613-2801
**Attorneys for Board of Election**
**Commissioners of the City of St. Louis**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above pleading was served on this 28th day of September, 2016, via the Court's electronic filing system and by electronic mail to the following counsel of record:

Jane Dueker
Arthur Gregg
1 North Brentwood Blvd
Suite 1000
Clayton, MO 63105
jdueker@spencerfane.com
agregg@spencerfane.com
Michael J. Colona
4387 Laclede Ave.
St. Louis, MO 63108
mikecolonalaw@gmail.com
ATTORNEYS FOR APPELLANT

David Roland
14779 Audrain Rd. 815
Mexico, MO 65265
libertyandjustice@gmail.com
ATTORNEY FOR RESPONDENT

*/s/ Matthew A. Jacober*

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - September 28, 2016 - 10:10 AM



**SAINT LOUIS**
**UNIVERSITY**
— EST. 1818 —

SCHOOL OF LAW

*Legal Clinics*

100 N. Tucker Blvd.
Suite 704
St. Louis, MO 63101

P  314-977-2778
F  314-977-1180

www.slu.edu

September 23, 2016

Mr. Erwin Switzer
Chairman
St. Louis City Board of Election Commissioners
300 North Tucker
St. Louis, Mo. 63101

Re: Accessible voting

Dear Mr. Switzer:

I represent Christopher Gray, who is the Executive Director of the Missouri Council of the Blind and a registered voter in the City of St. Louis, in connection with his desire to use an accessible voting machine during the absentee voting period for the November 8, 2016, election.

We have been told that the St. Louis City Board of Election Commissioners does not plan to have touch-screen voting machines, or the software that allows a blind person to vote using a "talking voting machine," available during the absentee voting period prior to the November election. We also understand that the Board may believe the recent decision by the Missouri Court of Appeals in *Franks v. Hubbard*, ED104797, restricts the type of absentee voting methods that can be used, so as not to allow the use of the touch-screen machines.

We believe that this position violates the Americans with Disabilities Act , Section 504 of the Rehabilitation Act, and the Help America Vote Act,, all of which are federal laws. Since federal law supersedes state law under the Supremacy Clause, the rights ensured by these acts must be given effect.

A recent decision by the Fourth Circuit Court of Appeals, *National Federal of the Blind v. Lamone*, supports our position in this matter. A copy of that decision is enclosed.

Higher purpose. Greater good.

EXHIBIT A

Therefore, Mr. Gray is requesting that a reasonable accommodation be made to allow him and others with disabilities who request it, to vote absentee at the election board office using a touch-screen machine programmed.  In the case of the blind, the machine should have audio software that will allow him to vote independently and privately on a "talking voting machine."

In addition, we request an assurance that the accessible machines will be available for absentee voting, in addition to election day voting, not just for federal elections, but for all local elections in the future as well.

We are prepared to pursue all appropriate legal remedies in the event we have not heard from you that this accommodation will be allowed.  Please advise us by 5 p.m. on Tuesday, September 27.

Thank you for your cooperation.

Sincerely,

John J. Ammann
Attorney at Law
Professor of Law

Enclosure

Case: 4:16-cv-01548-AGF    Doc. #: 6-1    Filed: 09/30/16    Page: 8 of 30 PageID #: 94

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - September 28, 2016 - 10:10 AM

813 F.3d 494
United States Court of Appeals,
Fourth Circuit.

NATIONAL FEDERATION OF THE BLIND; Kenneth Capone;
Melissa Riccobono; Janice Toothman, Plaintiffs–Appellees,

v.

Linda H. LAMONE, State Administrator, State Board of Elections, in her official capacity; David
McManus, Jr., Chairman, State Board of Elections, in his official capacity; Bobbie S. Mack, Meml
State Board of Elections, in her official capacity; Patrick J. Hogan, Member, State Board of Electic
in his official capacity; Michael R. Cogan, Member, State Board of Elections, in his official capaci
Kelly A. Howells, Member, State Board of Elections, in her official capacity, Defendants–Appella:

and

American Council of the Blind of Maryland; Verifiedvoting.Org;
Saveourvotes.Org; Cindy Labon; Charles Crawford; Jane Sheehan, Intervenors.

Civil Rights Education and Enforcement Center; Maryland Disability Law Center; Adapt Marylai
American Civil Liberties Union; Arc Maryland; Arc of the United States; Association of Assistive Tecl
Act Programs; Disability Law Center for Virginia; Disability Rights Advocates; Disability Rights I
Association; Disability Rights Education & Defense Fund; Disability Rights North Carolina; Freec
Center; Image Center for People with Disabilities; Independence Now; Judge David L. Bazelon Ce
for Mental Health Law; League for People with Disabilities; Maryland Developmental Disabiliti
Council; Maryland Disabilities Forum; National Association of the Deaf; National Disability Rigl
Network; On our Own of Maryland; Paralyzed Veterans of America; People on the Go; Protection
Advocacy for People with Disabilities; Southern Maryland Center for Independent Living; Unite
Spinal Association; West Virginia Advocates; United States of America, Amici Supporting Appelle

No. 14–2001.
|
Argued: Oct. 28, 2015.
|
Decided: Feb. 9, 2016.

**Synopsis**

**Background:** Blind, would-be voters in upcoming election brought cause of action under the Americans with I
Act (ADA), challenging Maryland's absentee voting program as violative of their rights. The United Stai
Court for the District of Maryland, Richard D. Bennett, J., 2014 WL 4388342, found that Maryland's abse1
program did not comply with the ADA and granted injunctive relief, and appeal was taken.

**Holdings:** The Court of Appeals, Floyd, Circuit Judge, held that:

[1] court had to focus on absentee voting program in particular, rather than on Maryland's voting program in i
in deciding whether Maryland's failure to make online ballot marking tool available for use in upcoming electic
blind would-be voters of "benefits of such service, program or activity" in violation of the ADA;

[2] Maryland's actions deprived blind, would-be voters of opportunity to participate in absentee voting pro was equal to that afforded to others;

[3] district court did not clearly err in finding that proposed modification was reasonable modification; and

[4] Maryland failed to satisfy its burden of showing that implementation of proposed modification, by mak ballot marking tool available for use in upcoming election, would fundamentally alter absentee voting progra

Affirmed.


West Headnotes (16)

[1]    **Federal Courts** ⬦ Questions of Law in General
       **Federal Courts** ⬦ "Clearly erroneous" standard of review in general
       Court of Appeals reviews judgments resulting from bench trial under a mixed standard of reviev findings may be reversed only if clearly erroneous, while conclusions of law are examined de novo.

       1 Cases that cite this headnote


[2]    **Civil Rights** ⬦ Discrimination by reason of handicap, disability, or illness
       To make out a violation of Title II of the Americans with Disabilities Act (ADA), plaintiffs must that they have disability, (2) that they are otherwise qualified to receive benefits of public service, pr activity, and (3) that they were denied the benefits of this service, program or activity, or otherwise disc against, on basis of their disability. Americans with Disabilities Act of 1990, § 202, 42 U.S.C.A. § 121

       1 Cases that cite this headnote


[3]    **Civil Rights** ⬦ Physical access and mobility;carriers
       Court had to focus on absentee voting program in particular, rather than on Maryland's voting pi its entirety, in deciding whether Maryland's failure to make online ballot marking tool available upcoming election deprived blind would-be voters of "benefits of such service, program or activity" in of their rights under the Americans with Disabilities Act (ADA); accordingly, mere fact that blin be voters had full access to Maryland's in-person polling places and ability to cast their votes in p not mean that there was no ADA violation if, due to Maryland's failure to make online ballot mai available, blind, would-be voters were denied ability, without third-party assistance, to use absentee b Maryland law authorized any voter to cast. Americans with Disabilities Act of 1990, § 202, 42 U.S.C./

       Cases that cite this headnote


[4]    **Civil Rights** ⬦ Handicap, Disability, or Illness

Americans with Disabilities Act (ADA) was enacted to remedy widespread discrimination against individuals. Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

Cases that cite this headnote

[5]     **Civil Rights**  ⟜  Administrative agencies and proceedings

Regulations promulgated by the Department of Justice to implement the Americans with Disabi (ADA) are given controlling weight unless they conflict with other departmental regulations or with itself. Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

Cases that cite this headnote

[6]     **Civil Rights**  ⟜  Physical access and mobility;carriers

Maryland's failure to make online ballot marking tool available for use in upcoming election, which blind, would-be voters from casting absentee ballots in election other than with assistance of th: deprived blind, would-be voters of opportunity to participate in absentee voting program that was equ afforded to others, in alleged violation of provision of the Americans with Disabilities Act (ADA). A with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

Cases that cite this headnote

[7]     **Civil Rights**  ⟜  Physical access and mobility;carriers

Voting is quintessential public activity, access to which is protected by the Americans with Disab (ADA); ensuring that disabled individuals are afforded an opportunity to participate in voting tha to that afforded to others helps ensure that disabled individuals are never relegated to position o powerlessness. Americans with Disabilities Act of 1990, § 202, 42 U.S.C.A. § 12132.

1 Cases that cite this headnote

[8]     **Civil Rights**  ⟜  Discrimination by reason of handicap, disability, or illness

Not all public services, programs or activities can be made meaningfully accessible to all citizens, an reason, in order to prevail on American with Disabilities Act (ADA) claim premised on denial of m access to public program, plaintiffs must propose a reasonable modification to the challenged progran allow them the meaningful access they seek. Americans with Disabilities Act of 1990, § 202, 42 U.S.C.A

Cases that cite this headnote

[9]     **Civil Rights**  ⟜  Discrimination by reason of handicap, disability, or illness

Proposed modification to public program in order to permit meaningful access thereto by the disabl be regarded as "reasonable modification," which public entity will have obligation to implement Americans with Disabilities Act (ADA), if proposed modification is reasonable on its face, or used or in the run of cases, and will not cause undue hardship. Americans with Disabilities Act of 1990, U.S.C.A. § 12132; 28 C.F.R. § 35.130(b)(7).

WESTLAW  © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Cases that cite this headnote

[10]   **Civil Rights**  ⟜  Discrimination by reason of handicap, disability, or illness

In cause of action under the Americans with Disabilities Act (ADA), determination of reasonal
proposed modification to public program in order to permit meaningful access thereto by the d
generally fact-specific. Americans with Disabilities Act of 1990, § 202, 42 U.S.C.A. § 12132.

Cases that cite this headnote

[11]   **Civil Rights**  ⟜  Physical access and mobility;carriers

District court did not clearly err, in cause of action brought by blind, would-be voters challenging M
absentee voting program as violative of their rights under the Americans with Disabilities Act (.
finding that online ballot marking tool which was previously made available by state for use in earlier
and which permitted blind voters to mark ballots on line without assistance of third party, was re
modification that would provide blind voters with meaningful access to absentee voting program, {
tool had already been developed, such that there did not appear to be any substantial cost or impler
burden, and given that tool was employed in earlier elections without any apparent incident. Ameri
Disabilities Act of 1990, § 202, 42 U.S.C.A. § 12132; 28 C.F.R. § 35.130(b)(7).

Cases that cite this headnote

[12]   **Civil Rights**  ⟜  Discrimination by reason of handicap, disability, or illness

Public entity need not implement even a reasonable modification to public program in order to
program meaningfully accessible to the disabled, if that modification would fundamentally alter the
Americans with Disabilities Act of 1990, § 202, 42 U.S.C.A. § 12132; 28 C.F.R. § 35.130(b)(7).

Cases that cite this headnote

[13]   **Civil Rights**  ⟜  Presumptions, Inferences, and Burdens of Proof

Defendants in cause of action under the Americans with Disabilities Act (ADA) bear burden of pro
proposed modification to public program, in order to make the program meaningfully accessible to the
would result in fundamental alteration of the program. Americans with Disabilities Act of 1990,
U.S.C.A. § 12132; 28 C.F.R. § 35.130(b)(7).

Cases that cite this headnote

[14]   **Civil Rights**  ⟜  Physical access and mobility;carriers

In cause of action brought by blind, would-be voters challenging Maryland's absentee voting
as violative of their civil rights, Maryland failed to satisfy its burden of showing that implemen
proposed modification, by making online ballot marking tool available for use in upcoming electic
fundamentally alter absentee voting program; while online ballot marking tool had not been ce
requisite supermajority of its state election board, as required by state statute, interests served by cer
requirement were sufficiently met by evidence that marking tool was reasonably secure, safeguarded

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - September 28, 2016 - 10:10 AM

Case: 4:16-cv-01548-AGF    Doc. #: 6-1    Filed: 09/30/16    Page: 12 of 30 PageID #: 98

voters' privacy, and had been used in earlier elections without any apparent incident. Americ
Disabilities Act of 1990, § 202, 42 U.S.C.A. § 12132; 28 C.F.R. § 35.130(b)(7).

1 Cases that cite this headnote

[15]    **Civil Rights**  ⚖  Physical access and mobility;carriers

Mere fact that state had statutory certification requirement for implementation of any proposed modif
its absentee voting program did not insulate state from making otherwise reasonable modification to
voting program to prevent discrimination against disabled would-be voters. Americans with Disabilit
1990, § 202, 42 U.S.C.A. § 12132; 28 C.F.R. § 35.130(b)(7).

1 Cases that cite this headnote

[16]    **States**  ⚖  Preemption in general

Supremacy Clause establishes that valid federal legislation can preempt state laws. U.S.C.A. Const. A₁

Cases that cite this headnote

**Attorneys and Law Firms**

*497  **ARGUED:** Julia Doyle Bernhardt, Office of the Attorney General of Maryland, Baltimore, Mar
Appellants. Jessica Paulie Weber, Brown, Goldstein & Levy, LLP, Baltimore, Maryland, for Appellees. Thoi
Chandler, United States Department of Justice, Washington, D.C., for Amicus United States of America. O
Brian E. Frosh, Attorney General of Maryland, Office of the Attorney General of Maryland, Baltimore, :
for Appellants. Daniel F. Goldstein, Brown, Goldstein & Levy, LLP, Baltimore, Maryland, for Appellee
Robertson, Civil Rights Education and Enforcement Center, Denver, Colorado; Alyssa R. Fieo, Maryland
Law Center, Baltimore, Maryland, for Amici Civil Rights Education and Enforcement Center, Maryland Disa
Center, ADAPT Maryland, American Civil Liberties Union, Arc Maryland, Arc of the United States, Ass
Assistive Technology Act Programs, disAbility Law Center for Virginia, Disability Rights Advocates, Disabi
Bar Association, Disability Rights Education & Defense Fund, Disability Rights North Carolina, Freedo
IMAGE Center for People with Disabilities, Independence Now, Judge David L. Bazelon Center for Men
Law, League for People with Disabilities, Maryland Developmental Disabilities Council, Maryland Disabiliti
National Association of the Deaf, National Disability Rights Network, On Our Own of Maryland, Paralyze
of America,  *498  People on the Go, Protection and Advocacy for People with Disabilities, Southern Maryla
for Independent Living, United Spinal Association, and West Virginia Advocates. Vanita Gupta, Princip
Assistant Attorney General, Mark L. Gross, Civil Rights Division, United States Department of Justice, W
D.C., for Amicus United States of America.

Before GREGORY, DUNCAN, and FLOYD, Circuit Judges.

**Opinion**

Affirmed by published opinion. Judge FLOYD wrote the opinion, in which Judge GREGORY and Judge I
joined.

WESTLAW  © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - September 28, 2016 - 10:10 AM

National Federation of the Blind v. Lamone, 813 F.3d 494 (2016)

52 NDLR P 122

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - September 28, 2016 - 10:10 AM

FLOYD, Circuit Judge:

Maryland allows any voter to vote via absentee ballot. A voter may obtain a blank hardcopy absentee ball[ot] fax, or by downloading and printing one from a website. The hardcopy ballot must be marked by hand, s[igned and] returned via mail or hand-delivery to the voter's local election board.

The National Federation of the Blind and individual disabled Maryland voters sued state election officials [under Title] II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act. Plaintiffs [alleged that] marking a hardcopy ballot by hand without assistance is impossible for voters with various disabilities, and tha[t they have] therefore been denied meaningful access to absentee voting. After a bench trial, the district court found that M[aryland's] program, as then structured, did not comport with ADA and Rehabilitation Act requirements. The district co[urt also] found that plaintiffs' proposed remedy—the use of an "online ballot marking tool" that would enable disable[d voters to] mark their ballots electronically—was a reasonable modification that did not fundamentally alter Maryland['s absentee] voting program. Defendant election officials now appeal all these aspects of the district court's decision. For t[he reasons] below, we affirm.

I.

A.

Elections in the State of Maryland are overseen by the State Board of Elections ("Board"). Md.Code Ann., [Elec. Law] §§ 2–101 to 102 (Westlaw current through the 2015 Regular Session of the General Assembly) ("Elec. Law"). [The Board] is comprised of five members. Elec. Law § 2–101(a). The Board appoints a State Administrator of Electi[ons, who is] designated as "the chief State election official" and tasked with administering Maryland's election apparatus. [...]

Maryland provides its voters with a number of different means to vote. Maryland has nearly 2,000 pollin[g places at] which a voter may cast a ballot on Election Day. The overwhelming majority of these polling places are ac[cessible to] physically disabled voters and are staffed with election judges trained in serving voters with disabilities. T[hese polling] place voting machines have a number of accessibility features designed to assist disabled voters in casting th[eir ballots.] Maryland's voting machines allow voters to magnify the font of the ballot, to alter the color contrast, and to p[rovide an] interface screen such that voters can sit down while casting their ballots. The voting machines can also be pr[ogrammed] for nonvisual access by means of an audio ballot; when using the audio features a voter receives a headset an[d a] keypad to navigate the ballot choices. Voters who desire assistance in marking their ballots may be assi[sted by an] individual of their choosing or by an election judge (in the presence of an election judge of another political p[arty]). *499 voting machines are not compatible with some common personal accessibility devices such as refresh[able braille] displays.

Maryland also allows voters to vote in person for an eight-day period before Election Day at sixty-four e[arly voting] polling stations. All of these early voting polling places are physically accessible.

Finally, any Maryland voter may vote by absentee ballot. A voter can obtain a ballot by mail, fax, or electr[onically by] downloading a ballot from a website. A voter who electronically downloads an absentee ballot must print ou[t the ballot] in hardcopy, mark their choices by hand, and then sign and return the hardcopy ballot to their local board o[f elections.] An absentee voter may designate an agent to pick up and deliver a ballot. Absentee voters may also have an [individual] of their choice assist them in hand marking the ballot.

52 NDLR P 122

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - September 28, 2016 - 10:10 AM

B.

Historically, as noted, an absentee voter who obtained an absentee ballot electronically needed to print out
ballot and mark their choices by hand on the printed hardcopy ballot. For several years, Maryland has been
a piece of software referred to as an "online ballot marking tool." The tool can be used by absentee voters w
to obtain their absentee ballots electronically; the tool enables voters to mark their choices electronically
out a completed ballot.[1] When the ballot is printed, the voter's selections appear on a number of pages foll
separate signature page. The voter must still sign the signature page and return the entire hardcopy ballot t
board of elections. Only printed and signed ballots received by a local board of elections are counted in d
the result of an election.

Maryland's Board developed the online ballot marking tool over a number of years, including with the pa
of plaintiff National Federation of the Blind. The Board has solicited feedback and implemented a number
and accessibility enhancements for disabled voters. The tool is not compatible with all computer browsers o
systems, but does function properly with a variety of reasonably up-to-date products. Importantly for indiv
certain disabilities, the ability to use the tool on their own computers may enable them to use the personal assis
that they ordinarily use to interface with the computer, such as a refreshable Braille display, to mark their bal

C.

An early, non-accessible version of the online ballot marking tool was available to absentee voters during
2012 primary elections. Following the primary elections, a question arose as to whether the tool needed to b
certified pursuant to Maryland Election Law Section 9–102, which requires certification of any "voting sys
to use. The Maryland Attorney General provided an opinion that the tool did not meet the statutory defi
"voting system" and did not require certification. *See Certification of Voting Systems Does Not Apply to Absen
Marking Wizard,* **\*500** 97 Op. Md. Att'y Gen. 32 (2012). However, apparently due to lingering concerns ove
of the online ballot marking tool, the Board only made the tool available to certain overseas and military abse
for the 2012 general election. Use of the tool in the 2012 primary and general elections was apparently unevo

The Maryland General Assembly subsequently clarified the status of the tool. In 2013, the General Assembly
"Improving Access to Voting Act," 2013 Md. Laws Ch. 157, which, among other things, explicitly required
to certify any online ballot marking tool prior to use by voters. *See id.* (codified at Elec. Law § 9–308.1). C
requires a supermajority: at least four of the five members of the Board must vote in favor of certification
Law § 2–102(c).

The Board continued to make improvements to the version of the tool that had been used in the 2012 ele
In particular, the Board implemented certain changes to make the tool more accessible to voters with
Additionally, in accordance with the 2013 Improving Access to Voting Act, the Board hired an independent
Unatek Inc. ("Unatek"), to perform security testing on the tool. Unatek produced a report in December 2013
that use of the tool was secure.

In February 2014, the Board met and discussed the online ballot marking tool. The Board reviewed the 2013 Unatek report and interviewed the report's author. Some Board members continued to express concerns security of the tool, and the Board did not hold a certification vote.

The Board subsequently hired a second independent consultant, Mainstay Enterprises, Inc. ("Mainstay"), to Unatek security report. The Mainstay audit concluded that Unatek's security assessment had followed ind practices. The Board also received and reviewed public comments and had Board staff obtain information of similar ballot marking tools in other states.

The certification issue was again discussed at the Board's April 2014 meeting. At the meeting, Mainstay briefed on the results of its audit. Some Board members continued to express concerns about certification and the not take a certification vote.

D.

On May 19, 2014, plaintiffs sued Linda Lamone, Maryland's State Administrator of Elections, and the ı members, all in their official capacities. At the heart of plaintiffs' suit are claims that Maryland's absentee voti violates the ADA and the Rehabilitation Act. Plaintiffs sought both a declaratory judgment to that effect as injunction requiring state election officials to make the online ballot marking tool available for use starting wit general election.[2]  The district court subsequently scheduled a bench trial to begin on August 13, 2014. Th would provide defendants with sufficient time to implement the tool before the 2014 general election in the plaintiffs prevailed.

While the suit was pending, the Board held a specially-scheduled meeting on July 10, 2014, with one Boaı absent. The four Board members in attendance voted 3 to 1 to certify the online ballot *501 marking tool. Tl not satisfy the statutory supermajority requirement and the tool was not certified.

The district court held a three-day bench trial beginning on August 13, 2014.[3]  The district court heard test the difficulties disabled voters have experienced while voting; the Board's development of the online ballot mi and the Board's deliberation over certification; the accessibility of the tool for disabled voters; and the sec posed by the tool.

The district court found that "the evidence demonstrated specific difficulties that some disabled voters have e while voting," J.A. 1043, and that "under the current absentee ballot voting program, individuals with disab as those of the Plaintiffs cannot vote privately and independently." J.A. 1044. The district court credited th a University of Baltimore usability study that concluded the tool was "highly accessible for disabled voters," 48, though the district court acknowledged that two individuals testified that they had difficulty accessing an tool during a public demonstration period. J.A. 1048. The district court found the tool "compatible with reas to-date computer and screen access software," "designed in accordance with the Web Content Accessibility G and "compatible with refreshable Braille displays." Id. The district court did find that there were still "ch private and independent voting by absentee ballot for disabled voters even when using the tool," including tha voters may need assistance in signing their ballots before submission." Id. "However, the testimony at trial als that, because the signature sheet prints on a separate page, the risk of disclosure of a disabled voter's sele minimalized and, in any event, was significantly less than that afforded under the current paper absentee ballot J.A. 1048–49.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - September 28, 2016 - 10:10 AM

52 NDLR P 122

With respect to the security risks posed by the online ballot marking tool, the district court credited expert that the tool "exhibited software independence, meaning a change to the voting software used for an electi cause an undetectable change to the outcome of an election" and that "there were no additional risks that did : other methods already available to Maryland voters." J.A. 1049. The district court found that the tool was "n some security risks" including that "malware could enable  **\*502** [a] third party to observe a voter's selection: "a voter's selections could be captured if a third party infiltrated the Board's server during the time a voter's and/or the printable ballot were being transmitted." J.A. 1049–50. Additionally, "[t]here was no evidence a the online ballot marking tool had been tested against intentional attempts to infiltrate or hack into the Boa or the tool." J.A. 1050.

The district court further found that "it is clear that most voters may mark their absentee ballots without i and that plaintiffs "should be afforded the same opportunity, but the State's current voting program does no it." J.A. 1055. Based on the facts found at trial, the district court concluded that plaintiffs had established th: been denied meaningful access to absentee voting in Maryland in violation of Title II of the ADA and Section Rehabilitation Act. The district court entered a declaratory judgment for plaintiffs to this effect. The district co concluded that plaintiffs' proposed remedy, access to the online ballot marking tool, was a reasonable modifi did not fundamentally alter Maryland's voting program. Consistent with these conclusions, the district co a permanent injunction prohibiting defendants from violating plaintiffs' rights under the ADA and the Reh Act and requiring defendants to make the online ballot marking tool available to plaintiffs for the 2014 gener This appeal followed.

## II.

[1]   We review judgments resulting from a bench trial under a mixed standard of review: factual findings ma) only if clearly erroneous, while conclusions of law are examined de novo. *Plasterers' Local Union No. 96 Pen: Pepper,* 663 F.3d 210, 215 (4th Cir.2011). We review the grant of a permanent injunction for abuse of discreti *Night Club v. Miller,* 637 F.3d 291, 297 (4th Cir.2011).

Defendants' appeal principally focuses on the district court's three core legal conclusions: (1) that plaintiffs denied meaningful access to absentee voting in violation of the ADA and the Rehabilitation Act; (2) that ballot marking tool constitutes a reasonable remedial modification; and (3) that requiring defendants to allov tool does not fundamentally alter Maryland's voting program. We address each of these issues in turn.

## III.

[2]   Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such d excluded from participation in or be denied the benefits of the services, programs, or activities of a public ei subjected to discrimination by any such entity." 42 U.S.C. § 12132. [4]  To make out a violation **\*503** of Title I must show: (1) they have a disability; (2) they are otherwise qualified to receive the benefits of a public service or activity; and (3) they were denied the benefits of such service, program, or activity, or otherwise discriminat on the basis of their disability. *Constantine v. Rectors & Visitors of George Mason Univ.,* 411 F.3d 474, 498 (4th

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

National Federation of the Blind v. Lamone, 813 F.3d 494 (2016)
52 NDLR P 122

[3]  Only the third of these elements—whether plaintiffs were denied the benefits of a public service, program
on the basis of their disability—is at issue here. [5]  Much of the dispute revolves around the proper way to
scope of the relevant public service or program at issue. Plaintiffs argue that the appropriate analytic scope is
absentee voting program. Defendants urge analysis of Maryland's voting program in its entirety, encomp
various voting alternatives—including in-person voting—available to Maryland voters. Defendants argue t
absentee voting is not fully accessible, the full accessibility of Maryland's in-person polling places provides disa
with meaningful access to voting. As explained below, we conclude that defendants' proposed focus is over
would undermine the purpose of the ADA and its implementing regulations.

A.

Defendants' argument for holistic consideration of Maryland's voting program is in some immediate tension w
of the ADA. Title II states that a disabled individual may not be "excluded from participation in or be denied t
of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.'
§ 12132. Defendants' proposed focus on voting in its entirety effectively reads out much of this language, sugg
Title II prohibits only complete exclusion from participation in broadly-defined public programs. However
disjunctive. By its own terms it is not limited only to public "programs"; it applies to "services, programs, *or*
*Id.* (emphasis added). Title II does not only prohibit "exclusion from participation" in a public program; it also
prohibits "den[ying] the benefits" of that program. *Id.* [6]  And in addition to those prohibitions, **\*504** Title II
generally prohibits "discrimination by any [public] entity." *Id.* Although the bare language of Title II does not r
resolve the question of appropriate scope, it does suggest to us that some granularity in analytic focus is nec

The Supreme Court has cautioned against defining the scope of a public benefit so as to avoid questions of disc
effects. In *Alexander v. Choate,* 469 U.S. 287, 301, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985), a Rehabilitation
a unanimous Court counseled that in assessing whether a disabled individual had been provided with r
access to a benefit, "[t]he benefit itself, of course, cannot be defined in a way that effectively denies otherwise
handicapped individuals the meaningful access to which they are entitled." *See also id.* at n. 21, 105 S.Ct.
with approval the government's statement that "[a]ntidiscrimination legislation can obviously be emptied of
every discriminatory policy is 'collapsed' into one's definition of what is the relevant benefit"). The logic of
further suggests that we should proceed cautiously to avoid defining a public program so generally that we ov
difficulties in accessing government services.

Also significant for our analysis of the proper scope of review here is the fact that Maryland allows *any* vo
by absentee ballot. Elec. Law §§ 9–301, 9–304. Absentee ballots are not provided only to a limited set of vo
demonstrated need to vote absentee; they are instead provided to the entire Maryland electorate at the opti
individual voter. On the whole, then, we think it is far more natural to view absentee voting—rather than
voting program—as the appropriate object of scrutiny for compliance with the ADA and the Rehabilitation

Defendants' remaining arguments against this straightforward conclusion are unpersuasive. Defendants cite
implementing regulation, 28 C.F.R. § 35.150(a), which they assert requires a reviewing court to view Maryla
program "in its entirety." However, the cited regulation expressly pertains to "existing facilities." *See id.* (
this regulation simply provides that a public entity does not have to make each of its facilities accessible
individuals with disabilities have access to that entity's offered public services. This regulation is targeted pr
physical accessibility and allows a public entity to provide accessibility alternatives that would not require
architectural modifications of existing facilities. *Accord Constantine,* 411 F.3d at 489 (discussing 28 C.F.R.

and explaining that "structural changes in existing physical facilities" are "probably the most expensive ent
providing accessibility).

Other ADA-implementing regulations, however, are applicable here and conflict with defendants' prop
on the entirety of Maryland's voting program. As one example, 28 C.F.R. § 35.130 ("General prohibitio
discrimination") directly implements the general antidiscrimination mandate of Title II. Subsection (b)
regulation requires public entities to make certain reasonable modifications in "policies, practices, or proced
the modifications are necessary to avoid discrimination on the basis of disability"; this regulation clearly cont
**505 focus on accessibility at a more granular level than entire government programs—the level of "policies
and procedures." *Id.* [7]

Defendants also cite to three district court decisions from other circuits that they argue stand for the propo
all aspects of a state's voting program must be viewed together when analyzing an ADA claim. Br. of Appella
It is not clear to us that the cited cases in fact support defendants' proposition; in any event, we find them un
Further, later decisions in some of those districts (and decisions by the courts of appeals sitting above them), i
the very argument defendants advance here. *See, e.g., United Spinal Ass'n v. Bd. of Elections in New York,* 882
615, 623–24 (S.D.N.Y.2012) ("It is abundantly clear that Defendants are obligated to provide a level of acc
voting program beyond the simple assurance that voters with disabilities are able to cast a ballot in some way
form."); *Disabled in Action v. Bd. of Elections in New York,* 752 F.3d 189, 198–99 (2d Cir.2014) ("[T]o assume
is ... merely the opportunity to vote at some time and in some way [ ] would render meaningless the mandate
entities may not afford persons with disabilities services that are not equal to that afforded others." (quotatior

B.

[4]    Having determined that Maryland's absentee voting program is the appropriate subject of our ADA
must determine whether absentee voting is accessible to disabled individuals as required by statute and imp
regulations. As the Supreme Court has explained:

> Congress enacted the ADA in 1990 to remedy widespread discrimination against disabled individuals. In st
> need for such legislation, Congress found that "historically, society has tended to isolate and segregate
> with disabilities, and, despite some improvements, such forms of discrimination against individuals with
> continue to be a serious and pervasive social problem."

*PGA Tour, Inc. v. Martin,* 532 U.S. 661, 674–75, 121 S.Ct. 1879, 149 L.Ed.2d 904 (2001) (quoting 42 U.S.C.
(2)). Congress explicitly found that discrimination was not limited to "outright intentional exclusion," but wa
found in "the 'failure to make modifications to existing facilities and practices.' " *Id.* at 675, 121 S.Ct. 1879 (
U.S.C. § 12101(a)(5)). After thorough investigation and debate, Congress concluded that there was a "compe
for a "clear and comprehensive national mandate" to both eliminate discrimination *and* to integrate **50
individuals into the social mainstream of American life. *Id.* (internal citations omitted). "In the ADA, Congre
that broad mandate." *Id.*

[5]    Congress has explicitly directed the Attorney General to promulgate regulations implementing Ti
discrimination mandate. 42 U.S.C. § 12134. Pursuant to this directive, the Department of Justice ("DoJ") pr
a number of regulations, including 28 C.F.R. § 35.130. That regulation provides:

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - September 28, 2016 - 10:10 AM

National Federation of the Blind v. Lamone, 813 F.3d 494 (2015)

52 NDLR P 122

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - September 28, 2016 - 10:10 AM

A public entity, in providing any aid, benefit, or service, may not ... [a]fford a qualified individua
with a disability an opportunity to participate in or benefit from the aid, benefit, or service that i
not equal to that afforded others ... [or] [p]rovide a qualified individual with a disability with an aid
benefit, or service that is not as effective in affording equal opportunity to obtain the same result

28 C.F.R. § 35.130(b)(1)(ii)-(iii). [8] We have recognized that "[t]he department's regulations are the agency's inte
of the statute, and they are therefore given 'controlling weight' unless they conflict with other departmental 1
or the ADA itself." *Seremeth,* 673 F.3d at 338 (citing *Stinson v. United States,* 508 U.S. 36, 113 S.Ct. 1913, 12
598 (1993), and *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L
(1984)).

[6]    We have little trouble concluding from the record before us that Maryland's absentee voting progra
provide disabled individuals an "opportunity to participate ... equal to that afforded others." *See* 28 C.F.R. ·
(1)(ii). The district court found that "it is clear that most voters may mark their absentee ballots without a
J.A. 1055. This finding is not clearly erroneous. The district court further found that Maryland's current abse:
program does not allow disabled individuals such as plaintiffs to mark their ballots without assistance. *Id.* T
is also not clearly erroneous. This sharp disparity makes obvious that defendants have provided "an aid,
service [to disabled individuals] that is not as effective in affording equal opportunity to obtain the same res
the same benefit, or to reach the same level of achievement as that provided to others." *See* 28 C.F.R. § 3
(iii). The ADA requires more.

Defendants do not seriously challenge the district court's factual findings concerning plaintiffs' current inabi
without assistance. Instead, defendants argue that plaintiffs have not been denied meaningful access to abse
because disabled individuals such as plaintiffs have no right to vote without assistance. *See* Br. of Appellants :
argument simply misapprehends the nature of plaintiffs' claims.

This case does not turn on whether there is a standalone right to vote privately and independently without
Plaintiffs' argument is that defendants have provided such a benefit to non-disabled voters while denying
benefit to plaintiffs on the basis of their disability. This is precisely the sort of harm the ADA seeks to prever
*Disabled in Action,* 752 F.3d at 199-200 ("Although [plaintiffs] were ultimately able to cast their vote with the
assistance of others, the purpose of the Rehabilitation Act is 'to empower individuals *507 with disabilities t
employment, economic self-sufficiency, *independence,* and inclusion and integration into society'.... The ri
should not be contingent on the happenstance that others are available to help." (emphasis by 2d Circuit) (
U.S.C. § 701(b)(1))); *Cal. Council of the Blind v. Cty. of Alameda,* 985 F.Supp.2d 1229, 1239 (N.D.Cal.2013) ("
blind and visually impaired individuals to vote with the assistance of a third party, if they are to vote at
provides these individuals with an inferior voting experience 'not equal to that afforded others.' " (quoting
§ 35.130(b)(1)(ii))).

[7]    Voting is a quintessential public activity. In enacting the ADA, Congress explicitly found that " 'indi
disabilities ... have been ... relegated to a position of political powerlessness in our society, based on charact
are beyond the control of such individuals.' " *Tennessee v. Lane,* 541 U.S. 509, 516, 124 S.Ct. 1978, 158 L
(2004) (quoting 42 U.S.C. § 12101(a)(7)). Ensuring that disabled individuals are afforded an opportunity to
in voting that is equal to that afforded others, 28 C.F.R. § 35.130, helps ensure that those individuals are nev
to a position of political powerlessness. We affirm the district court's conclusion that by effectively requiri
individuals to rely on the assistance of others to vote absentee, defendants have not provided plaintiffs with
access to Maryland's absentee voting program.

Case: 4:16-cv-01548-AGF     Doc. #: 6-1     Filed: 09/30/16     Page: 20 of 30 PageID #:
National Federation of the Blind v. Lamone, 813 F.3d 494 (2016)

52 NDLR P 122

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - September 28, 2016 - 10:10 AM

IV.

**[8]**    Determining that plaintiffs have been denied meaningful access to absentee voting does not end our analy
public services, programs, or activities can be made meaningfully accessible to all citizens, or at least they canno
so without a prohibitive cost or unreasonable effort on the part of the public entity. For this reason, to preva
ADA claim, plaintiffs must propose a reasonable modification to the challenged public program that will a
the meaningful access they seek. *See, e.g., Halpern v. Wake Forest Univ. Health Scis.,* 669 F.3d 454, 464 (4th
(noting that federal law mandates that federal grantees and public accommodations make "reasonable" mod
to accommodate persons with disabilities).[9]

**[9]    [10]**    DoJ regulations implementing the ADA explain that "[a] public entity shall make reasonable mod
policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of c
28 C.F.R. § 35.130(b)(7).[10]    A modification is reasonable if it is "reasonable on its face" or used "ordinarily or
of cases" and will not cause "undue hardship." *Halpern,* 669 F.3d at 464 (citing *U.S. Airways, Inc. v. Barnet*
391, 401–02, 122 S.Ct. 1516, 152 L.Ed.2d 589 (2002)); *cf. Henrietta D. v. Bloomberg,* 331 F.3d 261, 280 (2d
(stating that the burden of establishing the reasonableness of an accommodation is " 'not a heavy one' " and
enough for the plaintiff to suggest  *508  the existence of a plausible accommodation, the costs of which, facia
clearly exceed its benefits" (quoting *Borkowski v. Valley Cent. Sch. Dist.,* 63 F.3d 131, 138 (2d Cir.1995))). Dete
of the reasonableness of a proposed modification is generally fact-specific. *Halpern,* 669 F.3d at 464.

**[11]**    The district court here found that plaintiffs' proposed modification—the online ballot marking tool
reasonably secure and reasonably accessible to disabled voters. Reviewing the record as a whole, these findi
appear clearly erroneous and we see no need to disturb them. Further, although not determinative by itself, tl
a version of the tool was voluntarily implemented by defendants in the 2012 elections—"without any apparen
J.A. 1057—speaks to the reasonableness of using the tool. Additionally, because the tool has already been
there does not appear to be any substantial cost or implementation burden that would need to be borne by
to make the tool available for use. On the facts before us, we conclude that plaintiffs' proposed use of the on
marking tool is a reasonable modification to Maryland's absentee voting policies and procedures.

V.

**[12]    [13]    [14]**    Defendants correctly argue that even a reasonable modification to Maryland's absentee v
need not be made if that modification would "fundamentally alter" the program. *See* 28 C.F.R. § 35.130(b)(7
669 F.3d at 464. Defendants bear the burden of proving that the requested modification would be a fu
alteration to the program. *See* 28 C.F.R. § 35.130(b)(7). After considering defendants' arguments and rev
record as a whole, we conclude that they have not met this burden.

Defendants' principal argument is that certification of voting systems, including certification of the online ball
tool under Election Law Section 9–308.1, is fundamental to Maryland's voting program. They argue fro
requiring them to make the online ballot marking tool available for plaintiffs' use, where that tool has not y
the statutorily-required supermajority vote, works a fundamental alteration to Maryland's voting program.
defendants argue, the district court abused its discretion in enjoining them to make the tool available to pla
disagree.[11]

National Federation of the Blind v. Lamone, 813 F.3d 494 (2016)

52 NDLR P 122

[15]  [16]  As an initial matter, the strong form of defendants' argument—that the mere fact statutory requirement insulates public entities from making otherwise reasonable modifications to prevent discrimination—cannot be correct. The Constitution's Supremacy Clause establishes that valid federal legis: pre-empt state laws. *Oneok, Inc. v. Learjet, Inc.*, — U.S. —, 135 S.Ct. 1591, 1595, 191 L.Ed.2d 511 (2015) (c Const. Art. VI, cl. 2). The Supreme Court has held that the ADA's Title II, at least in certain circumstances, a valid exercise of 14th Amendment powers, *Lane*, 541 U.S. at 533–34, 124 S.Ct. 1978, and as such it tru regulations that conflict with its requirements. As the Sixth Circuit has put it, "[r]equiring public entities to mak to rules, policies, practices, or services is exactly what the ADA does." **\*509** *Jones v. City of Monroe, MI*, 474, 487 (6th Cir.2003) (citing *Oconomowoc Residential Programs, Inc. v. City of Milwaukee*, 300 F.3d 775, 7! Cir.2002)), *abrogated on other grounds by Anderson v. City of Blue Ash*, 798 F.3d 338 (6th Cir.2015); *accord N v. New York State and Local Ret. Sys.*, 707 F.3d 144, 163 (2d Cir.2013) ( "If all state laws were insulated fror reasonable modification requirement solely because they were state laws ... the ADA would be powerless to reasonable modification in any requirement imposed by state law, no matter how trivial the requirement and how minimal the costs of doing so.").

However, we also think that the converse proposition cannot be correct either. Certain requirements of state la fact be fundamental to a public program in a way that might resist reasonable modifications otherwise necessa that program into compliance with the ADA. Defendants here urge that Maryland's statutory certification re is just such an example: certification, they argue, goes to the very heart of the voting program by ensuring the i the voting process as a whole. Public confidence in elections is undoubtedly an important governmental conce the record before us defendants simply have not established their premise, that is, that use of the online ballc tool degrades the integrity of Maryland's voting processes.

Put another way, defendants are merging Maryland's *procedural* certification requirement with substantiv about whether the tool should be certified. The mere fact that a procedural requirement has not been me necessarily mean that the underlying substantive purpose of that requirement has not been met. The underlyin is fact-specific. *See, e.g.*, *Halpern*, 669 F.3d at 464–67; *cf. Jones*, 341 F.3d at 480 ("In cases involving waiver o rules and regulations, the overall focus should be on whether waiver of the rule in the particular case wou odds with the purposes behind the rule that it would be a fundamental and unreasonable change." (quotation The relevant inquiry here is not whether certification qua certification is fundamental to Maryland's voting but whether use of the tool without certification would be so at odds with the purpose of certification tha would be unreasonable. [12]

Here, the district court found, after a three-day bench trial, that the tool is reasonably secure, safeguards disat privacy, and (in earlier versions at least) has been used in actual elections without apparent incident. [13] We do these findings are clearly erroneous and defendants have not provided any substantial reasons that they shoul into question. *Cf., e.g.*, *Pepper*, 663 F.3d at 215 ("[I]f the district court's account of the evidence is plausi: of the record in its entirety, we will not reverse the district court's finding simply because we have become that we would have decided the question of fact differently." (quoting *TFWS, Inc. v. Franchot*, 572 F.3d 18 Cir.2009))). On the record as a whole, we do not conclude that use of the online ballot marking tool is so at o with the purposes of certification that its use would be unreasonable. We agree with the district court that have not met their burden to show that plaintiffs' proposed modification—use of the online ballot marking tc fundamentally) alter Maryland's voting program.

WESTLAW  © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - September 28, 2016 - 10:10 AM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - September 28, 2016 - 10:10 AM

VI.

We recognize that some of the standard analytic language used in evaluating ADA claims—"failure to make r accommodations"; "denial of meaningful access"—carries with it certain negative connotations. We would in not highlighting that the record is devoid of any evidence that the defendants acted with discriminato in implementing Maryland's absentee voting program. Indeed, we recognize that Maryland's decision to pr excuse" absentee voting to all its citizens provides a benefit that is far from universal across the United States

However, the ADA and the Rehabilitation Act do more than simply provide a remedy for intentional discr They reflect broad legislative consensus that making the promises of the Constitution a reality for i with disabilities may require even well-intentioned public entities to make certain reasonable accommoda conclusions here are not driven by concern that defendants are manipulating the election apparatus inten discriminate against individuals with disabilities; our conclusions simply flow from the basic promise of equalit services that animates the ADA.

For the foregoing reasons, we affirm.

*AFFIRMED*

**All Citations**

813 F.3d 494, 52 NDLR P 122

Footnotes

1    The tool provides the voter an interface program on the computer they are using. Voters mark their ballots using tl program and are then presented with a review screen that allows voters to verify that their selections are accur voter confirms the selections, the computer transmits the information to the state election board's computer serve: generates a marked ballot in the form of a PDF file, which the voter can then print out.

2    Plaintiffs also sought a preliminary injunction requiring election officials to make the tool available for the Ju primary election. The district court held a hearing on June 11, 2014, and ultimately denied plaintiffs' request.

3    On August 1, 2014, less than two weeks before trial, several individuals and entities who were similarly situated to p filed a motion to intervene in the case. The putative intervenors asserted similar ADA and Rehabilitation Act c with additional claims against Maryland state officials under 42 U.S.C. § 1983 for various alleged constitutiona The putative intervenors argued that their rights had been violated in ways substantially similar to plaintiffs, bi almost diametrically opposed remedy-an injunction barring certification of the online ballot marking tool. Very putative intervenors appeared to be concerned that the tool plaintiffs sought to require Maryland to use was no accessible to disabled voters.

The district court held a conference with all parties and the putative intervenors on August 8, 2014. With th of the parties, the district court held the motion *sub curia* and permitted the putative intervenors to participate In its memorandum opinion in this case, the district court ultimately granted the motion to the extent of the participation up to and through trial, and considered the intervenors' evidence and legal arguments in reaching the district court denied the motion to the extent the intervenors sought to assert independent claims against the It does not appear that either the parties or the intervenors have appealed any part of the district court's dispo: issue, and we see no reason to disturb it.

4    Section 504 of the Rehabilitation Act similarly provides that "[n]o otherwise qualified individual with a disability States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the

National Federation of the Blind v. Lamone, 813 F.3d 494 (2016)

52 NDLR P 122

or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U

"Claims under the ADA's Title II and the Rehabilitation Act can be combined for analytical purposes because is 'substantially the same.' " *Seremeth v. Bd. of Cty. Comm'rs Frederick Cty.*, 673 F.3d 333, 336 n. 1 (4th Cir.201 *Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1265 n. 9 (4th Cir.1995)). Because under the circumstances this case plaintiffs' ADA and Rehabilitation Act claims rise and fall together, for simplicity our opinion combine principally analyzes the ADA claim. *Cf., e.g., A Helping Hand, LLC v. Baltimore Cty., Md.*, 515 F.3d 356, 362 (4t ("Congress has directed courts to construe the ADA to grant at least as much protection as the Rehabilitation implementing regulations.").

5   Title II allows plaintiffs to pursue three distinct grounds for relief: (1) intentional discrimination or disparate tr disparate impact; and (3) failure to make reasonable accommodations. *A Helping Hand, LLC*, 515 F.3d at 362. somewhat mischaracterize plaintiffs' claims as advancing a disparate impact theory of discrimination. *See,* Appellants 38. While some sort of disparity will necessarily be present in cases of discrimination, that does not m discrimination cases are legally evaluated as "disparate impact" cases; we do not interpret plaintiffs' arguments a a legal disparate impact theory (and the district court did not evaluate them as such). We understand plaintiffs to their claims on the theory that defendants have failed to make reasonable accommodations that would affc individuals meaningful access to Maryland's absentee voting program.

6   The United States, as *amicus*, suggests that defendants would still be in violation of Title II even were we to cc Maryland's entire voting program was "the" program subject to Title II's requirements. We acknowledge that it i view the ability to vote from the comfort of one's home as one of the "benefits" of Maryland's overall voting p denial of which benefit on the basis of disability might support a Title II claim. However, given our conclusion be must evaluate Maryland's absentee voting program directly, we need not address the United States's contention.

7   As another example, 28 C.F.R. § 35.160 states that "[a] public entity shall take appropriate steps to ensure that com with [disabled persons] are as effective as communications with others" and "shall furnish appropriate auxilia services where necessary to afford individuals with disabilities ... an equal opportunity to participate in, and enjoy of, a service, program or activity of a public entity." *Id.* § (a)(1), (b)(1). The requirement to provide "auxiliary aids a again suggests to us that accessibility cannot be adequately assessed at the highest level of program abstraction. States argues that this particular regulation alone is a sufficient basis to affirm the decision here. Br. for Unit Amicus Curiae 17–19. We think that the ADA itself and the general anti-discrimination regulation discussed ab the most direct resolution in this case. We therefore need not consider whether there might be other independer support an ADA or Rehabilitation Act claim on the facts here.

8   The Rehabilitation Act's regulations impose similar requirements. *See, e.g.*, 45 C.F.R. § 84.4(b)(1)(ii)-(iii).

9   *Halpern* was a Title III and Rehabilitation Act case. We have noted that in general the different language of Title the Rehabilitation Act should be construed together to the extent possible. *Halpern*, 669 F.3d at 461–62 (collecti

10  The regulations, however, do not require implementation of even reasonable modifications where the "publi demonstrate that making the modifications would fundamentally alter the nature of the service, program, or C.F.R. § 35.130(b)(7). We address defendants' "fundamental alteration" defense below.

11  Given our conclusion that use of the online ballot marking tool does not fundamentally alter Maryland's program no abuse of discretion in the district court's decision to issue the injunction as the other factors to be considered in favor of granting injunctive relief. *Cf. Legend Night Club*, 637 F.3d at 302–03.

12  The problem with conflating procedure and substance here can be illustrated by analogy to the archetypal physical modifications often associated with the ADA. It would be difficult for a government entity to resist installation of, wheelchair ramps for a new courthouse, solely by enacting a law requiring that ramps be certified and then declin any ramps.

13  Nothing in the post-trial record indicates any problems with the use of the tool by plaintiffs in the 2014 gen subsequent to the district court's decision.

---

**End of Document**
　　　　　　　　　　　　　© 2016 Thomson Reuters. No claim to original U.S. Govern

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - September 28, 2016 - 10:10 AM

Case: 4:16-cv-01548-AGF    Doc. #: 6-1    Filed: 09/30/16    Page: 24 of 30 PageID #: 110

9/27/2016                 Absentee problems revealed in St. Louis election will affect others come November | Political Fix | stltoday.com

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - September 28, 2016 - 10:10 AM

# Political Fix

http://www.stltoday.com/news/local/govt-and-politics/absentee-problems-revealed-in-st-louis-election-will-affect-others/article_71352b91-7aaa-525b-b671-08643ec780c7.html

## Absentee problems revealed in St. Louis election will affect others come November

By Stephen Deere and Doug Moore St. Louis Post-Dispatch    Sep 26, 2016



Benjamin Phillips, (left), a St. Louis Election Board Commissioner, prepares election worker on Friday, Sept. 16, 2016, to begin th official counting of absentee ballots in a special election to decide the winner of Missouri's 78th district state representative sea between Penny Hubbard and Bruce Franks. Photo by Christian Gooden, cgooden@post-dispatch.com

EXHIBIT B

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - September 28, 2016 - 10:10 AM

**ST. LOUIS •** For years, election authorities in some of Missouri's most populous counties have routinely ignored the painstaking process outlined in state law for handling absentee votes.

The penalty for those violations will become more evident as the November presidential election nears and those agencies confront a logistical dilemma: How to open tens of thousands of additional ballot envelopes on Election Day?

Earlier this month, St. Louis Circuit Judge Rex Burlison tossed out the results of a state House race in the Aug. 2 Democratic primary solely on a technicality: The St. Louis Board of Election Commissioners had allowed 142 people to vote absentee at the board's office without using envelopes.

In the August race for the 78th District seat, State Rep. Penny Hubbard had defeated Bruce Franks Jr. by 90 votes.

"These irregularities were more than petty procedural infirmities but abuses of the election law which cannot be ignored," Burlison said.

Missouri's Court of Appeals agreed with the judge, and in the re-do election on Sept. 16, Franks defeated Hubbard, garnering 76 percent of the vote.

The fallout from that court battle has created a challenge for some election authorities who must change the way they have operated. Absentee voting for the Nov. 8 election begins Tuesday.

The Post-Dispatch contacted election authorities in Missouri's 10 most populated counties. In addition to St. Louis city, St. Louis County, Jefferson County and the Kansas City Board of Elections have either allowed in-person absentee voters to feed their paper ballot into a box or to use electronic touch screens — practices deemed to be a clear violation of state law because they don't involve ballot envelopes containing information on each voter.

Burlison's ruling was a hot topic at the annual Missouri Association of County Clerks and Election Authorities held this week in Sikeston, Mo., and it also came up in training sessions on the other side of the state.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - September 28, 2016 - 10:10 AM

"We're not making changes because, I'll be real honest, we've always followed the law," said Jim McKinzie, assistant director of Jackson County Board of Election Commissioners, during a break last week from training workers.

"I was just telling them: 'We do not want to be a St. Louis, so follow the rules like I've outlined, like we've always done, and we won't be in the paper,'" McKinzie said.

## The fallout

Why are envelopes so important?

Under state law, representatives from opposing campaigns are allowed to witness election workers as they unseal envelopes containing absentee ballots and challenge them if an election violation is suspected.

But once a ballot is placed in a box or filled out electronically, it becomes impossible to challenge, because it is no longer connected to the voter. Unlike their envelopes, ballots contain no information identifying the voter.

Now, to comply with Missouri's absentee voting statutes, St. Louis County will likely have to open thousands of additional ballot envelopes on Election Day.

That means hiring additional workers and finding the space for them, said Eric Fey, Democratic director of the St. Louis County Election Board.

"Judge Burlison was correct in what he said in his ruling that it's a very 'tedious' and 'specific' process," Fey said.

Christian Tolbert, the Republican director, said in an email that it is expected to cost $250,000 "for the additional 40,000 envelopes and 60,000 ballots as well as funding 80 more temporary employees for the five day opening period."

In Jefferson County, County Clerk Wes Wagner estimates officials will have to open 15,000 ballots. Wagner is recruiting college and high school students to help out.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - September 28, 2016 - 10:10 AM

With veteran poll workers supervising, the students will open the envelopes with a letter opener, unfold them and then feed them into an optical scan machine. Wagner estimates two ballots can be processed a minute, about 1,200 a day per team. With 12 to 14 teams, absentee ballots should be counted by the time the polls close, Wagner said.

J. Casey Martin, board chairman of the Kansas City Election Board, said: "We've reviewed that case thoroughly and we are talking with our legal counsel to make sure all practices for the Nov. 8 election are up to snuff."

## Which law to violate?

Selena Gomez: Most Beautiful Hair Ever with Pantene Expert | Pantene Commercial



Officials at St. Louis and Kansas City election authorities, along with those in Jefferson and St. Louis counties, all make the same argument for why they have allowed in-person absentee voters to use touch screens.

Federal law, specifically the Help American Vote Act of 2002, demands it, they say. Congress passed the act in the aftermath of the 2000 presidential election that revealed mass confusion among Florida voters by "butterfly ballots" and "punch card" voting.

The law provided funds to local election authorities for electronic voting machines. It also mandated each polling location have a voting system accessible to individuals with disabilities, including a non-visual system for the blind. The voting system must provide an equal opportunity for voting in private without assistance.

Thus, some state election officials argue that the federal law has forced them to provide electronic voting for absentees.

Wagner said the "back channel" discussions have always been: "What set of laws are we going to violate? State laws or federal laws?"

But at least one other county clerk suggested the choice may not be so difficult.

Boone County Clerk Wendy S. Noren agreed that her office must offer visually impaired voters a means to fill out their ballot in private because federal law trumps state law.

So Noren allows anyone with a disability to use a machine for absentee voting at county clerk's office leading up to the election — but that's the only exception.

Everyone else puts their ballot in an envelope.

"The federal law doesn't require it (to be available) for everybody," Noren said.

And how many times in the past decade has she had voters with disabilities request electronic voting?

Twice, she said.

## St. Louis' impact

St. Louis politics has long been an impetus for election reform.

In fact, the roots of some of Missouri's "tedious" and "specific" absentee voting laws at issue now were created because of irregularities during the 1982 Democratic primary in St. Louis — which saw allegations of vote buying, intimidation and bulk notarizations.

A campaign worker, a notary and a minister were indicted.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - September 28, 2016 - 10:10 AM

"They were actually going around selling votes in those days," Noren said. "It was $10 a vote."

The late James Kirkpatrick, then Missouri's secretary of state, put Noren on a panel to recommend legislation to prevent abuses.

In the primary election in August, a Post-Dispatch investigation has revealed multiple other irregularities in addition to the failure to use envelopes for in-person absentee ballots. The problems included allegations of intimidation and falsified ballot applications.

Noren wrote some of the statutes with which St. Louis is now grappling. When she heard about challenges faced by other election authorities in advance of the November election, she didn't have much sympathy. To her, the law is clear, especially when a procedure in the law is prefaced by the word "shall."

"The envelopes are a mess," she said. "Every single one of us would love to (do away with them), but the law says we have to do it. ... Life would be easier if we didn't have all these 'shalls' and I could just do what I wanted."

That said, the Missouri Legislature has changed the policy for having envelopes accompany absentee ballots cast in person. However, the new law does not go into effect until 2018.

### Election 2016 from St. Louis Post-Dispatch

Stay in the race. Get our free political newsletter featuring local and national updates and analysis.

| Email | | Sign Up! |

## Stephen Deere
Stephen Deere is a reporter for the St. Louis Post-Dispatch.

## Doug Moore
Doug Moore is a reporter for the St. Louis Post-Dispatch.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - September 28, 2016 - 10:10 AM